**IN re Ignacio and Gloria ABRAHAM, f/d/b/a El Abajeno Restaurant f/d/b/a El Abajeno, Inc., Debtors.**

**Bankruptcy No. 92–31241–LMC.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

Jan. 3, 1994.

Carl T. Johnson, El Paso, TX, for debtors.

Andrew B. Krafsur, El Paso, TX, Chapter 7 Trustee.

William A. Frazell, Office of the U.S. Trustee, San Antonio, TX.

## DECISION AND ORDER ON TRUSTEE'S APPLICATIONS TO EMPLOY PARA-PROFESSIONALS

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the Application of Andrew B. Krafsur, Chapter 7 Trustee, to Employ Paraprofessionals. The United States Trustee objected. Upon consideration thereof, the court finds and concludes as follows.

### JURISDICTION

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This a core matter as provided by 28 U.S.C. § 157(b)(2)(A).

### 1. Background of this case

The debtors in this case have filed for relief under chapter 7 of title 11 of the United States Code. Andrew B. Krafsur was appointed as Chapter 7 Trustee. The Trustee seeks to employ two assistants (the "Paraprofessionals") to assist him in administering the chapter 7 estate.[1]

---

**1.** The court has under advisement a number of other chapter 7 cases being handled by the same trustee, their outcomes dependent on the ruling in this case. All involve the same request for

In addition to the efficient administration of the estate, the Trustee submits that the employment of these two paraprofessionals is necessary so that the court can award compensation for their services, in addition to the Trustee's commission set by 11 U.S.C. § 326(a). The Trustee argues that his office has operated the "trustee business" at a loss ever since his appointment to the panel. The Trustee implies that he may not continue to serve as a trustee if forced to continue to suffer a yearly financial loss.[2]

The Trustee is a lawyer, a member of a local lawfirm, Mayfield & Perrenot ("M & P"). The paraprofessionals he seeks to employ are paralegals employed by the firm, which pays their salary and benefits. Normally, these paralegals' services are billed to clients at an hourly rate of $80 to $85 an hour. The Trustee has used these paralegals to assist him in his trustee duties in the past, but at a considerable loss to the firm.[3] The paralegals are quite skilled, both having extensive bankruptcy experience, and offer a significant benefit to the Trustee's operation.

The Trustee proposes to hire these two paralegals as "paraprofessionals" at a rate of $40 and $45 per hour, respectively, "to perform duties in direct service to the estate including, but not limited to, services the Trustee lacks the expertise to perform himself and services which aid and facilitate the Trustee's ability to administer the estate[s]."

The application for employment was motivated by anticipated opposition to their compensation by the United States Trustee. The Trustee seeks authorization to employ *nunc pro tunc*, relying upon the precedent set out in *Cavazos v. Simmons*, 90 B.R. 234 (N.D.Tex.1988).[4]

The United States Trustee ("UST") objects to the employment of the Paraprofessionals. The UST argues that Section 326(a) of the Bankruptcy Code is the sole source of compensation for trustee services, regardless of whether the Trustee himself performs the services or whether a paraprofessional per-

---

paraprofessional assistance and are not factually or legally distinguishable from this one.

**2.** The Trustee sets out a parade of horribles if he and other trustees cannot recover as a separate compensable item the billing rate of paraprofessionals employed by the firm:

"1). competent trustees who try to hire any talented help to enable them to handle a volume of work will lose substantial sums out of their pockets for every small estate they administer;

2). competent trustees will be forced to seek to avoid small cases; and

3). under the "you get what you pay for" rationale, more and more cases will end up being handled, if at all, by trustees who are not competent and who will be willing to try to slop through the administration of an estate on a shoestring budget and with insufficient effort and attention."

Trustee's Amended Memorandum of Authorities in Support of Application to Employ Paraprofessionals Nunc Pro Tunc, pp. 18–19. Adds the Trustee, "Recognizing these concerns, the court in *In re Marsh*, 14 B.R. 615, 616 (Bankr.E.D.Va. 1981), observed that, in small cases, the limitation upon bankruptcy trustee compensation makes such compensation so inadequate as to be 'near scandal' and 'an absurdity in the Bankruptcy Code.' *Marsh*, at 616." *Id.*

There is much truth in what the Trustee says, and strong reasons for Congress to address the problem. However, it is also worth noting that the problem is not new:

Before § 72 [of the Act] was added ... by the amendatory Act of February 5, 1903, 32 Stat. 797, the compensation allowable to trustees was so meager that few competent men would serve as trustee, thus crippling the administration of the law. Consequently, efforts were made to meet the difficulty in various ways, as by appointing attorneys to be trustees and allowing them compensation for legal services as an expense of administration ... by appointing attorneys for trustees in asset cases, with a tacit understanding that the attorney's allowance should be shared with the trustee ... or by allowing trustees extra compensation as agents of the creditors when they did more than perform the regular duties required by the law. ...

2A, COLLIER ON BANKRUPTCY, ¶ 48.10, p. 1816.1, note 5 (14th ed. 1978) (citations omitted).

**3.** The paralegals' overhead allocation is approximately $29,000 each per year, but the trustee operation has recouped only about $3,500 for both of them. The Trustee estimates that he is losing between $27,000 and $40,000 per year by continuing to serve as Trustee because he cannot recoup the cost of using these paraprofessionals. The loss is actually a loss being sustained by the firm.

**4.** The Trustee maintains that such application is in fact not necessary, relying on this self-same case. He has filed the applications, however, in an abundance of caution.

forms the services at the Trustee's direction. The UST acknowledges that expenses for clerical help are a reimbursable expense, and routinely approves trustees' final reports that contain such items. Secretarial costs, postage, and the like are allowed at cost, over and above the trustee's fee permitted under Section 326(a). But, argues the UST, paraprofessionals are another matter entirely. Their cost is not a reimbursable expense within the meaning of Section 330(a)(2), especially because, in this case, the Trustee is seeking recovery for their hourly billing rate and not their actual cost. If trustees can in fact hire paraprofessionals, as is suggested by Section 330(a)(1), well and good, but the "subject to" language in Section 330(a) (which caps the compensation for trustee's services otherwise allowed by Section 330(a)(1) by reference to Section 326) applies not only to the Trustee's request for compensation but also to the request for compensation for the Trustee's paraprofessionals.

In essence, the thrust of the UST's argument is that paraprofessionals of any sort are never billed as an independent billing center, but only as part of the work force of the professional for whom they work. Just as paralegals for a debtor's law firm are only compensated to the extent that their services are included in the attorney's application for compensation, so also, argues the UST, should a trustee's paraprofessionals be compensated to the extent that their services are included in the *trustee's* application for compensation. And since the trustee's compensation is capped by virtue of Section 326, so also, by extension, is the compensation for paraprofessionals of the trustee (because they cannot submit an application for compensation apart from the professional by whom they are employed). If there is a practical problem created by the Code, says the Trustee, then it is for Congress to address. The courts should not attempt to judicially amend the statute, regardless the harsh consequences.

### 2. *Statement of the problem*

The problem is quite simple. It costs money to operate the office of a panel trustee, money for the personnel who keep the books, reconcile the bank statements, prepare the Form 1 and Form 2 and the various paperwork required by the United States Trustee, money for the storage and sale of assets, money for the lawyers to pursue litigation, money for the accountants to prepare estate tax returns, money for the heat and the lights, and money for the paper, the computers, the office furniture and the rent. And despite the plethora of bankruptcies since the enactment of the Bankruptcy Code in 1978, a distressing large number of them are either "no-asset" cases (for which the trustee is paid $45 to handle) or small assets cases, which generate a paltry fee but require the full panoply of trustee services (bookkeeping, bank reconciliations, investigation of causes of action, collection and sale of assets, maintenance of accurate accounts, preparation of reports, etc.). The hope that a few large cases generating a large fee for the trustee to offset the losses realized from handling numerous small cases has not been realized in many jurisdictions.[5]

The American Bankruptcy Institute's National Report on Professional Compensation in Bankruptcy Cases, released in May 1991, made detailed findings regarding trustee compensation. The study focused on small cases and no-asset cases. With regard to no-asset cases, the vast majority of trustees surveyed responded that the current $45 statutory fee was too low (51% reported that it was "much too low"). And in small asset cases, "[t]he trustees reported that compensation in asset cases was only marginally more adequate than in no-asset cases...." *Id.* at 209–210.

> [N]o respondents reported that the fee was either "much too high" or "somewhat high." Thus, both the judges and trustees reported that there is an undercompensation problem, with the trustees reporting that the problem is quite serious.

. . . . .

**5.** R. WARNER (REPORTER), AMERICAN BANKRUPTCY INSTITUTE, NATIONAL REPORT ON PROFESSIONAL COMPENSATION IN BANKRUPTCY CASES (1991), at p. 214, n. 76.

A blended average hourly rate can be computed by dividing the statutory maximum $480 [6] fee by the sum of the mean average trustee time spent and mean average time spent by other office personnel. Performing that computation, the blended average hourly rate for trustee work in small asset Chapter 7 cases works out to $22 per hour. If the time spent by other office personnel is ignored, and only the trustee time considered, the average hourly rate rises to only $36, a rate even lower than the similar figure for no-asset consumer cases.... If only trustee time is considered, approximately one quarter receive an average hourly rate of $96 or more, and approximately one quarter receive an average hourly rate of $24 or less. Even the larger of these figures is higher than the hourly rates of only 12 percent of the accountants surveyed, and only $15 per hour higher than the mean of the lowest associate hourly rates that lawyers reported that their firms charged for Chapter 11 debtor work. ($81).

These figures suggest that trustees are under-compensated in both no-asset and small asset Chapter 7 cases.

R. WARNER (REPORTER), AMERICAN BANKRUPTCY INSTITUTE, NATIONAL REPORT ON PROFESSIONAL COMPENSATION · IN BANKRUPTCY CASES (May 1991), p. 212. The Report also observed (somewhat ominously) that "trustees generally employ their own firms as lawyers or accountants for the estate" perhaps as a way to offset undercompensation as trustees. *Id.*, at p. 41.[7]

Although respondent groups appeared to favor the status quo, the reason for that view may have less to do with the benefits that flow from the trustee's self-employment than with a practical concern that qualified trustees would desert the system if they could not employ themselves. Of the trustee respondents who are lawyers or accountants, 80 percent report that they would not continue to serve as trustees if they could not employ their own firms as lawyers or accountants. ... [T]he departure of such a large segment of the trustee population might well have a disastrous effect on the system ...

Thus, the self-employment issue must not be viewed in isolation, but rather must be considered as part of the larger issue of the adequacy of trustee compensation.... [T]he compensation allowed trustees for their "trustee" services appears to be inadequate. If that is so, then the self-employment option may function as one of the safety valves for the compensation system. This conclusion is consistent with evidence in the survey data that the perceived inadequacy of trustee compensation may well be distorting the courts' treatment of a range of issues involving trustees.

*Id.*, at p. 43.

The ABI National Report properly focuses a good deal of its attention on the problem of trustees hiring themselves as their own attorneys, in an effort to offset the inadequacy of trustee compensation, suggesting that, while the practice may be problematic, it is also operating as a kind of "safety valve" for the system. Another way in which trustees have attempted to ameliorate their difficulties is to employ paraprofessionals and to seek compensation for their services at the paraprofessionals' hourly rate. Courts are deeply divided on this issue, and have struggled with a variety of constructs to both make sense of the less than enlightening provisions of the Bankruptcy Code and to somehow keep the system from collapsing. *See Cavazos v. Simmons*, 90 B.R. 234 (N.D.Tex.1988) (paraprofessionals may be compensated at their hourly billing rate, but need not be retained as professionals); *In re*

---

6. The survey restricted its scope to asset cases under $10,000.

7. The Report also notes that most trustees' *overall* income (including their compensation in their professional capacities as lawyers or accountants) is roughly comparable to lawyer mean annual income. The Report suggests that "the section 327(d) authorization for trustees to employ themselves as professionals may be the safe-ty valve that enables the system to continue functioning." *Id.* at 215. But the Report also cautions that, "[u]nless and until the missing safety valve factor, or factors, can be isolated, attempts to alter the trustee reimbursement practices or the self-employment practices, without also remedying the under-compensation problem, could prove disastrous." *Id.*

Orthopaedic Technology, Inc., 97 B.R. 596 (Bankr.D.Colo.1989) (paraprofessionals may be compensated at their hourly rates, to the extent documented, but not for "clerical services" and not for overhead items deemed subsumed in their hourly rate); In re Stewart, 151 B.R. 255 (Bankr.C.D.Cal.1993) (paraprofessionals are subject to the trustee's section 326 cap); In re Lanier Spa, Inc., 99 B.R. 490 (Bankr.N.D.Ga.1989) (restricting paraprofessional compensation with the § 326 cap protects estates from gouging by unscrupulous trustees); In re Hagan, 145 B.R. 515 (Bankr.E.D.Va.1992) (paraprofessionals' services must be separated from trustee's services (to avoid impermissible delegation of duties), and can be billed separately, but are subject to the § 326 cap); In re Berglund Constr. Co., Inc., 142 B.R. 947 (Bankr. E.D.Wash.1992) (same); In re Prairie Cent. Ry. Co., 87 B.R. 952 (Bankr.N.D.Ill.1988) (overall rationale for permitting use of paraprofessionals is to reduce, not increase, cost of administration; thus, § 326 cap must apply to their fees); In re Blue, 146 B.R. 856 (Bankr.W.D.Okla.1992) (any services performed by the paraprofessional in fulfillment of the trustee's duties but which are "nonprofessional" in nature are subject to the statutory cap). To fully appreciate the problem, however, we must start not with the cases but with the underlying statutory provisions.

### 3. Statutory background

There are three statutory provisions that control the question of paraprofessional compensation, and they must be read in pari materia to appreciate the problem with which courts have been struggling. When read together, the conflicts and ambiguities which have bedeviled the courts emerge. But so also do some valuable insights that should guide us to a sensible solution.

#### a. Section 704

Section 704 defines the duties of a chapter 7 panel trustee. The section says that the trustee shall

(1) collect and reduce to money the property of the estate for which such trustee serves, and close the estate as expeditiously as is compatible with the best interests of parties in interest;

(2) be accountable for all property received;

(3) ensure that the debtor shall perform his intention as specified in section 521(2)(B) of this title;

(4) investigate the financial affairs of the debtor;

(5) if a purpose would be served, examine the proofs of claims and object to the allowance of any claim that is improper;

(6) if advisable, oppose the discharge of the debtor;

(7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;

(8) if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires; and

(9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee.

11 U.S.C. § 704. The principle question raised by this section of the Code, for our purposes, is not so much what the duties are as it is the extent to which these duties may be permissibly delegated. At the outset, it is important to realize that delegation is the rule, not the exception, in chapter 7 administration, and that such delegation, far from being impermissible, is both essential to efficient case administration and, in the usual circumstance, raises no especial concerns for the court. Some examples may be helpful.

One obligation of the trustee is to object to the debtor's discharge if appropriate. Assuming that it is, a lawsuit will immediately ensue, and the trustee is likely to hire a lawyer to press it (either herself or someone else). Is this an impermissible delegation?

Of course not. It is a *contemplated* delegation. The same can be said of the duty to object to claims, to pursue preference actions, or to recover on lawsuits that are assets of the estate. The trustee is the party whose duty it is to take these actions, but, in the process of taking them, she hires professionals to do the actual work—professionals who of course must have a client in order to take action, and who must be answerable to that client for how the matter is handled, and on what terms the matter may be settled. The professional is actually performing the duty of the trustee, but the professional is but an agent for its principle, and so cannot *be* the trustee.

What about collecting and reducing to money property of the estate? Again, to get the job done, the trustee hires professionals: an auctioneer to sell off personalty, a broker to sell off realty. Again, the trustee is the client, for whose benefit these professionals work, but the one actually doing the liquidating, the reducing to money, is the professional. Yet we do not (nor should we) complain about impermissible delegation of trustee duties.

These examples are easy, of course. The trustee does not delegate these matters out of convenience but out of necessity. Other duties are a closer question, but the same approach to the problem sheds some light. The trustee has to be accountable for all property received. So where does the trustee store the inventory of fork lifts? In her office parking lot? At her home? Of course not. The trustee finds a storage lot and rents it. The actual storage is a delegation of the trustee's duty to be accountable for the estate's property. The trustee is the one ultimately responsible for the property, and cannot escape liability by blaming the storage lot if the fork lifts are inadvertently sold by the storage lot owner (though she may have a cause of action against him). But the trustee nonetheless *delegates* this duty to others.

Suppose the trustee wants to investigate the financial affairs of the debtor. If she hires an accountant, does anyone complain? No. What if she hires a private investigator? Again, little complaint. Is any of this an impermissible delegation of the trustee's duties? No.

What about the maintenance of books and records, reconciliation of bank statements and the like? These are all part of the trustee's duty to keep accurate records so that she can file accurate reports of the estate's affairs, including the trustee's final report. The secretary or bookkeeper responsible for these duties is actually the person to whom this particular duty of the trustee has been delegated. In fact, with the advent of Form 1 and Form 2, these are some of the most important duties the trustee performs, yet we do not expect the trustee to input this data herself. We simply require the trustee to make sure it's done, and to be responsible for what's reported. She cannot lay off mistakes on the secretary or the bookkeeper (she can only fire them), but she nonetheless delegates these tasks.

We come to the paraprofessionals. What duties might a trustee justifiably delegate to this person? The Trustee here suggests investigation of financial records or assets to determine whether causes of action should be pursued, initial review of proofs of claim to see whether objections are advisable, maybe maintenance of accounts in complicated cases. All of these would appear to be justifiable delegations, perfectly in line with the kinds of delegations discussed above.

Delegation is also mandated at least in part by current United States Trustee guidelines for panel trustees, which require that more than one person handle funds of the estate, and maintain appropriate books and records of account. Here, the trustee is not just *permitted* to delegate—she is *required* to delegate.

None of this is meant to imply that there are no limits on delegation. We might well criticize a trustee for "unnecessary delegation," when the cost of such delegation becomes prohibitive relative to the benefits realized. One way judges can and should control such "overdelegation" is at the point when an outside professional is proposed to be retained. Judges should feel no compunctions about requiring trustees to justify their retention of professionals, and to deny ap-

proval when the facts and circumstances of the case confirm that the particular duty can be done effectively by the trustee herself without assistance.[8] Another point of control occurs at the approval of the Trustee's Final Report, when trustees must disclose their staffing arrangement and seek reimbursement for those expenditures.[9]

But the touchstone is *not* that some duties simply *cannot* be delegated, as some cases suggest. Rather, it is that, on a case by case basis, some duties *should not* be delegated, given the nature of the work, the economics of the case, and the administrative burden on the trustee.

 With one exception. There is one trustee "duty" that can never be delegated, and for which the trustee must *always* be held accountable—and for which trustees should justifiably be compensated, even if all actual work is being performed by others. The trustee and only the trustee is ultimately responsible for the administration of the estate, including most significantly the safeguarding and responsible disposition of estate assets and their distribution to creditors. We expect the trustee to make sure that all those persons to whom duties have been delegated do their jobs right—or else. The trustee can *not* delegate the ultimate responsibility or the decisionmaking that is part and parcel of her office. She is the one who decides who to hire and whether to hire. She alone decides how an estate asset is to be disposed of, albeit with input from an assistant. She alone must make sure that the estate is administered expeditiously. For that increasingly heavy responsibility, the trustee must be compensated, even if the trustee personally does nothing else in the case. *See In re Melenyzer*, 140 B.R. 143, 157 (Bankr.W.D.Tex.1992); *see also Estes & Hoyt v. Crake (In re Riverside–Linden Inv. Co.)*, 925 F.2d 320, 324 (9th Cir.1991) (emphasizing trustee's responsibility to expeditiously administer bankruptcy estates); *accord Yadkin Valley Bank & Trust Co. v. McGee (In re Hutchinson)*, 5 F.3d 750, 753–54 (4th Cir.1993).[10]

The delegation issue has consumed considerable judicial attention in the Section 327(d) context, when the trustee hires herself as her own attorney or accountant, for there is an inherent conflict of interest and real potential for abuse when a trustee performs her services in the guise of attorney or accountant, billing the estate for those services at her hourly professional rate and, in the process, evading the statutory cap on trustee compensation. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess 329 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6285.[11] Courts are

---

**8.** For example, in a relatively small case, a trustee may be able to quickly review the proofs of claim and conclude that no further outside assistance will be needed to perform that duty.

**9.** The United States Trustee already exercises a good deal of oversight at this level, both through their regulation of permissible reimbursement levels for office personnel and through the auditing process.

**10.** It is worth adding here what Colliers 14th edition had to say about the essence of the trustee's duties under the Act:

> The duties enumerated in [section 47 of the Act] are not exclusive. ... His [sic] paramount duty is to conserve and advance the interests of the estate entrusted to him, which he can do only by keeping himself clear of alliances which tempt to make the estate's interest subordinate to his own. Vested with the title of the bankrupt, he is also the representative of the creditors, and should deal fairly between them and the bankrupt. He is, further, a *quasi* officer of the court, and as such is subject to its direction in all matters concerning money or property which may come into his possession by virtue of his office. In all matters entrusted to him, the trustee must exercise the diligence of a prudent businessman.

J. Moore, L. King, 2A Collier On Bankruptcy, ¶ 47.02, at pp. 1743–45 (14th ed. 1974).

**11.** The purpose of permitting the trustee to serve as his [sic] own counsel is to reduce costs. It is not included to provide the trustee with a bonus by permitting him to receive two fees for the same *services* or to avoid the *maxima* fixed in section 326. Thus, this subsection requires the court to differentiate between the trustee's services as trustee, and his services as trustee's counsel, and to fix compensation accordingly. Services that a trustee normally performs for an estate without assistance of counsel are to be compensated under the limits fixed in section 326. Only services that he performs that are normally performable by trustee's counsel may be compensated under the maxima imposed by this section.

*Id.*

properly concerned about impermissible delegation in this context.

But the specialized Section 327(d) delegation problem has also colored the way courts have approached all of the rest of the subsidiary issues of trustee compensation as well, including the retention and compensation of paraprofessionals. *See, e.g., In re Stewart,* 151 B.R. 255, 259 (Bankr.C.D.Calif.1993); *In re Berglund Constr. Co., Inc.,* 142 B.R. 947, 949 (Bankr.E.D.Wash.1992); *In re Prairie Central Railway Co.,* 87 B.R. 952, 959 (Bankr.N.D.Ill.1988). This is unfortunate, for, as has already been demonstrated, the generic delegation of duties is part and parcel of routine case administration. While it is perfectly permissible to ask whether, in a given case, a trustee can perform a given task without assistance, we should *not* succumb to the temptation to define some "inner core" of trustee's duties as "non-delegable" (other than the ultimate fiduciary responsibility of being a trustee and the decisionmaking that goes with that responsibility), for in truth no such "inner core" exists. The special rules we employ in the Section 327(d) context are mandated by the special problems of conflict of interest and self-dealing that that statute necessarily creates. In virtually every other aspect of delegation, the test must be premised primarily on whether the trustee needs assistance, and whether the cost of that assistance can be justified. It is not fair to either trustees or those to whom they delegate specific tasks to measure that innocent delegation by the more rigorous (and frankly pejorative) standards normally reserved for the conflicts-laden Section 327(d) situation. The evil sought to be contained when a trustee hires herself as her own attorney is the danger of double collection. There is no such taint present when the trustee simply delegates a task to someone *other than* herself. There is only the simpler question of whether it is economically and administratively sound to delegate, imposing an additional cost on the estate.

The foregoing discussion helps us to put the remaining statutory provisions (and the conflicting case law) into perspective. Helps, but does not resolve, however, for though we may have disposed of the shibboleth of "impermissible delegation," we still have only a rough idea of what constitutes "trustee's services." [12] And the statutory provisions governing compensation for trustee's fees and trustee's professionals, and reimbursement for trustee's expenses are decidedly less than clear.

### b. Section 326

Section 326 places a cap on "compensation" of the trustee for the trustee's "services."

(a) In a case under Chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1,000 or less, six percent on any amount in excess of $3,000, and three percent on any amount in excess of $3,000, upon all moneys distributed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including the holders of secured claims.

11 U.S.C. § 326(a). Nowhere in the statute are "trustee's services" defined. Only trustee's *duties* are set forth in the Code. 11 U.S.C. § 704. But as we have already seen, trustee's duties are routinely *delegated.* Does the cap extend to all the performance of all trustee duties, regardless by whom performed and to whom delegated, or does it apply only to that portion of those duties performed in person by the trustee? Nor does the statute tell us whether "personal services" of the trustee means literally what the trustee personally does or extends also to the work of the trustee's office personnel. If the latter, then conceivably the statutory cap also extends to any compensation or reim-

---

12. We can safely say that part of what constitutes "trustee's services" in all cases is the fiduciary responsibility assumed by the trustee in any case. And we can also safely say that, in those cases in which a court declines to authorize the retention of a professional to perform a particular duty, the trustee's own performance of that duty is a service rendered by the trustee. Difficult questions remain, however, regarding whether certain expenses incurred by the trustee's office represent a compensable or reimbursable delegation of duties or rather constitute the "performance" of that duty "by" the trustee (and so are expected to be absorbed as an overhead item).

bursement sought for those personnel. But even then, we do not know how *far* it extends.

The ambiguity of the statute compels us to look beyond the language of the statute itself for assistance in divining Congressional intent. Unfortunately, the legislative history to this section offers virtually no guidance. Other than opining that the statutory cap is intended to be applied as a maximum rather than a minimum, the legislative history makes no comment regarding for what "services" the fee is intended to serve as compensation. H.R.REP. No. 595, 95th Cong., 1st Sess. 327 (1977).

The reference in the legislative history to Section 48(c) of the former Bankruptcy Act is similarly unhelpful, as the Act *also* failed to specify what constituted compensable trustee services, as distinguished from the activities delegated to others. *See* Bankruptcy Act of 1898, § 48, *codified at* 11 U.S.C. § 76 (repealed). The Act did, however, permit separate compensation for the attorney or accountant hired by the trustee, (Section 48, Former Bankruptcy Rule 219), and also permitted the trustee to recover her "expenses of administration" in addition to the statutory commission (Section 48(c)(1), Former Bankruptcy Rule 219(c)(2)). The most we learn from this look back is that "trustee's services" under the Act were evidently whatever the trustee did on her own (i.e., without the assistance of professionals), exclusive of "expenses necessarily incurred in the performance of his [sic] duties and allowed upon the settlement of his accounts." Former Bankruptcy Rule 219(c)(2); *see generally* J. MOORE, L. KING, 2A COLLIER ON BANKRUPTCY, ¶¶ 48.01, 48.04 (trustees' fees), 48.06 (trustees' commissions in normal administration), 48.08 (compensation for conducting business), 48.08[2] (expenses) (14th ed. 1974). We do not know what should be included in the notion of performing services "without assistance" (does the trustee's paraprofessional count as assistance, or is he presumed to be incorporated in the trustee's services?), nor do we know what qualifies as "expenses necessarily incurred" properly severable from those services and separately reimbursed. We certainly cannot tell from a facial reading of the statute whether "trustee's services" extends to the trustee's paraprofessional. The statute offers no assistance.

The ambiguity over what constitutes "trustee's services," for purposes of accurately and fairly applying the statutory cap in Section 326, is heightened when we read that section *in pari materia* with Section 330.

### c. Section 330

 The trustee is, of course, not expected to perform her duties for free, and so Section 330(a) permits a trustee to be compensated for services she renders in the performance of these duties (though as earlier observed, it is not entirely clear just what that really means). Nor is the trustee expected to do the job alone. The trustee may hire professionals to help her, 11 U.S.C. § 327, and those professionals are permitted to apply to the court for compensation out of the estate. 11 U.S.C. § 330(a)(1). The trustee is also permitted to seek compensation for herself *and for* her paraprofessional. *Id.* And the trustee may recover for the expenses she incurs to the extent they are actual and necessary. 11 U.S.C. § 330(a)(2).

Section 330(a) says that

(a) After notice to any parties in interest and to the United States Trustee and a hearing, and *subject to sections 326,* 328 and 329 of this title, the court may award *to the trustee,* to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) *reasonable compensation for actual, necessary services rendered by such trustee,* examiner, professional person or attorney, as the case may be, *and by any paraprofessional persons employed by such trustee,* professional person or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; *and*

(2) *reimbursement for actual, necessary expenses.*

11 U.S.C. § 330(a) (emphasis added).

Immediately obvious from the highlighted language is the conundrum posed by this

section of the Code. The *entire* section is cabined by the "subject to" language in the forepart of the statutory sentence, yet not all of the limitations referenced apply in all situations. For example, the trustee's cap referenced in Section 326 is certainly not expected to apply to the compensation of professionals retained in a chapter 11 case, but it is less clear the extent to which the cap applies in a chapter 7 case. It could limit only the trustee's *own* request for compensation, or it could be read to extend to the trustee's paraprofessional compensation as well. It could also be read to encompass the requests for compensation made by professionals retained by the trustee. And its placement in the statutory sentence would permit it to delimit requests for reimbursement of expenses as well. Because we still do not know what constitutes "trustee's services" for purposes of compensation, we have difficulty deciding with any certainty the extent to which the "subject to" language is supposed to apply in this section.

The inherent ambiguity of the facial language of the statute, especially when read against the backdrop of Section 326(a) (and its undefined notion of "trustee's services")[13] forces us to abandon any hope that the "plain

---

13. The error of many courts has been to assume that they "know" what constitutes trustee's services and what does not. But the lack of unanimity and specificity in the decisions demonstrates the fallacy of that assumption. *See, e.g., Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1201 (5th Cir.1981); *In re J.M. Wells, Inc.*, 575 F.2d 329, 331 (1st Cir.1978); *In re McKenna*, 93 B.R. 238, 240 (Bankr.E.D.Calif.1988); *In re King*, 88 B.R. 768, 770 (Bankr.E.D.Va.1988); *In re Wildman*, 72 B.R. 700, 706 (Bankr.N.D.Ill.1987); *In re Stable Mews Assoc.*, 49 B.R. 395, 398 (Bankr. S.D.N.Y.1985). What is more, virtually all of the case law on this topic focuses on the Section 327(d) issue. Outside that context, most, if not all, of the duties spelled out there can be and usually are delegated, and Section 704 does not furnish a guide for what constitutes trustee's services, in the more general context when routine delegation takes place. And Section 326(a) does not define the term. Arguing that trustee's services constitute those duties which cannot be delegated, as many courts do, simply begs the question.

The United States Trustee furnished to the court a memorandum entitled "Trustee Compensation/Expense Guidelines (Region 7)" dated January 30, 1992, which collected cases which attempted to define one or another aspect of "trustee services." Here are some of the items courts have "identified" as "trustee services" in published decisions:
 · Collecting accounts receivable
 · Routine demands and negotiations
 · Presenting simple, uncontested motions for sale
 · Preparing a liquor license renewal
 · Advertising the sale of assets
 · Contacts with prospective purchasers
 · Locating buyers for assets
 · Attending an auction, preparing the auction report, and arranging for payment of auction proceeds
 · Selling estate real estate
 · Delivering a bill of sale
 · Arranging insurance coverage
 · Supervising bank transactions
 · Investing funds, and maintaining records therefor
 · Reviewing the debtor's schedules
 · Reviewing assets
 · Investigating the existence of security interests
 · Attending the § 341 meeting
 · Investigating the debtor's business affairs
 · Obtaining the debtor's books and records
 · Reviewing accounts receivable records
 · Reviewing title reports
 · Arranging for an appraisal
 · Reviewing the claims register
 · Corresponding regarding documentation of claims
 · Preparing and filing objections to claims
 · Responding to inquiries concerning claims
 · Corresponding with creditors regarding the status of a case or status of property of the estate
 · Working on trustee reports
 · Preparing the final report
 · Preparing distribution schedules
 · Conferring with attorneys
 · Furnishing tax information
 · Ascertaining tax liability
 · Preparing applications to employ professionals
 · Corresponding with an auctioneer
 · Coordinating activities with disbursing agents and accountants
 · Organizing pleadings and document files
 · Reviewing creditor notices
 · Meetings with debtor's counsel
 · Paying routine bills
 · Supervising debtor's employees
 · Preparing form documents
 · Testifying at hearings
 · Miscellaneous matters

The list goes on for four pages, concluding, in capital letters, "THIS LIST IS NOT INTENDED TO BE EXHAUSTIVE." And there are virtually no items on the list that would not, in one circumstance or another, be legitimately delegated to *someone* other than the trustee herself. So much for the suggestion that "everyone knows what constitutes trustee's services."

meaning" rule of statutory construction will resolve our problem. *Watt v. Alaska*, 451 U.S. 259, 265–67, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981). We must therefore be prepared to look beyond the statute for assistance in divining Congress' intentions. Unfortunately, here again we confront a less than helpful legislative history.

We have already alluded to the difficulty of isolating what constitutes "trustee's services," for purposes of compensating that particular officer. Section 330(a)(1) tells us only that trustees are to be granted "reasonable compensation" (evidently subject to the statutory cap of Section 326) for "actual, necessary services rendered *by*" the trustee. The legislative history which discusses this language is utterly silent on what those services for which reasonable compensation is to be allowed might be. Nor does it offer any guidance as to how to apply the notion of "reasonable compensation" to trustees. The House Report devotes its attention to the proper interpretation of this phrase *as applied to attorneys* (who usually bill at an hourly rate, presumably unfettered by any statutory cap). H.R.REP. No. 595, 95th Cong., 1st Sess. 329–330 (1977), U.S. Code Cong. & Admin. News 1978, p. 6286.[14] There is no indication whatsoever that Congress gave any thought to how the same statutory phrase should be applied to evaluating *trustees'* compensation. If anything,

we receive contradictory signals from the House Report, which just a few pages earlier, in its discussion of the statutory cap, cautions against *overpaying* trustees, yet here cautions against *underpaying* officers and professionals. And of course, trustees are *not* attorneys (not even when it is an attorney functioning as the trustee).

The legislative history is equally unenlightening in its discussion of "trustee's paraprofessionals"—because there is no discussion. Once again, the House Report focuses its attention on attorneys, extolling the virtues of *attorneys'* use of paraprofessionals as a substitute for more expensive attorneys, and suggesting that estates will receive a savings as a result. HOUSE REPORT, *supra* at 330. The Report adds that *law firms* should not be penalized for using paraprofessionals by not being able to bill them out just as they do their attorneys. Rather than forcing attorneys to absorb paraprofessionals as part of their overhead, the Report expressly authorizes attorneys to recover as part of their compensation the hourly charges of paraprofessionals. *Id.*[15] The discussion is thoroughly unenlightening regarding the rationale for authorizing *trustee's* paraprofessionals, for trustees, unlike attorneys, do not bill estates at an hourly rate, and trustee compensation is capped at a percentage of assets, so that no savings comparable to attorneys'

---

**14.** The compensation is to be reasonable, for actual, necessary services rendered, based on the nature, the extent, and the value of the services rendered, *and on the cost of comparable services other than in a case under the bankruptcy code.* The effect of this last provision is to overrule *In re Beverly Crest Convalescent Hospital, Inc.,* 548 F.2d 817 (9th Cir.1976, as amended in 1977), which set an arbitrary limit on fees payable, based on the amount of the district judge's salary, and other, similar cases that require fees to be determined based on notions of conservation of the estate and economy of administration. If that case were allowed to stand, *attorneys that could earn much higher incomes in other fields would leave the bankruptcy arena.* ... Bankruptcy fees that are lower than fees in *other areas of the legal profession* may operate properly when the attorneys appearing in bankruptcy cases do so intermittently, ... Bankruptcy specialists, however, if required to accept fees in all of their cases that are consistently lower than fees they

could receive elsewhere, will not remain in the bankruptcy field.
*Id.* (emphasis added).

**15.** This subsection ... provides for compensation of paraprofessionals employed by professional persons employed by the estate of the debtor. The provision is included to reduce the cost of administering bankruptcy cases. In nonbankruptcy areas, attorneys are able to charge for a paraprofessional's time on an hourly basis, and *not include it in overhead.* If a similar practice does not pertain in bankruptcy cases, then *the attorney* will be less inclined to use paraprofessionals even where the work involved could easily be handled by an attorney's assistant, at much lower cost to the estate. This provision is designed *to encourage attorneys to use paraprofessional assistance where possible,* and to ensure that *the estate, not the attorney,* will bear the cost, to the benefit of both the estate and the attorneys involved.
*Id.* (emphasis added).

paraprofessionals is realized by a trustee's use of trustee's paraprofessionals.

Certainly, in 1978, the paraprofessional phenomenon was sufficiently new that Congress deemed it important to grant attorneys express authorization to treat their paraprofessionals as a billing unit rather than an item of overhead, and that explains in large part the comments in the legislative history. But trustees, with their statutory cap, would have no incentive to bill paraprofessionals at an hourly "professional" rate. One can fairly assume that Congress simply did not give any particular thought to this issue, either when it drafted the legislative history or when it included "trustee's paraprofessionals" in the statute itself.

The legislative history also affords us little guidance about what to do about Section 330(a)(2). That subsection authorizes a trustee to recover actual, necessary expenses incurred in the performance of her duties. The House Report unhelpfully opines that "[t]his subsection provides for reimbursement of actual, necessary expenses." HOUSE REPORT, at p. 330, U.S. Code Cong. & Admin. News 1978, p. 6286. The Senate Report is silent. The statute itself can be read to place all requests for reimbursement of trustee expenses under the 3% cap of Section 330(a), but neither practical reality nor the backdrop against which the Bankruptcy Code was enacted support such a conclusion.

Were the 3% cap to apply to all expenses incurred by a trustee, then the cost of our trustee's storing her inventory of forklifts would have to be subsumed as an item of overhead (albeit one detailed in her application for compensation). So also would the cost of a Rule 2004 examination, the cost of changing locks, the cost of a UCC search or title examination, the cost of security services, and the cost of a safety deposit box for jewelry and other small, valuable items. So also would postage, long-distance phone calls, the cost of travelling to a distant location to examine assets, and even the cost of filing an adversary proceeding to object to the debtor's discharge. The practical effect of forcing those costs under the trustee's statutory cap would be the abandonment of valuable assets in virtually every small case.

It is doubtful that this was Congress' intent, especially in light of pre-Code practice. Under the Act, expenses of administration were reimbursable, over and above the trustee's commission. Observes *Colliers*, 14th edition,

> Former General Order 35(3) provided that "the compensation allowed to receivers or trustees by the Act shall be in full compensation for the services performed by them; *but shall not include expenses necessarily incurred in the performance of their duties* and allowed upon the settlement of their accounts."

> General Order 35(3) was superseded on October 1, 1973, by Bankruptcy Rule 219(c)(1) which provides:

> "The compensation allowable by the court to a trustee ... shall be reasonable, and in making allowances the court shall give due consideration to the nature, extent, and value of the services rendered as well as to the conservation of the estate and the interests of creditors."

> • • • • •

> Bankruptcy Rule 219(c)(2) superseded § 72 of the Act. It provides:

> The compensation allowed by the Act to a trustee ... shall be in full compensation for the services performed by him as required by the Act and by these rules, *but shall not be deemed to cover expenses necessarily incurred in the performance of his duties* and allowed upon the settlement of his accounts.
> . . .

2A COLLIER ON BANKRUPTCY, ¶ 48.09[2], at p. 1813, ¶ 48.09[3], at p. 1816.2 (14th ed. 1978) (emphasis added). Thus, the somewhat ancient backdrop against which the Code was enacted was one in which the trustee's expenses were presumed recoverable outside the fee cap. That being the case, it is fair to assume that the "subject to" limitation in Section 330 was intended to apply only to the trustee's fee, and not to the trustee's various expenses.

But that conclusion also introduces further ambiguity into Section 330, for nothing in the "plain language" of the statute itself prevents

the "subject to" language from delimiting the "reimbursable expenses" portion of Section 330(a). By the same token, if we determine that the "subject to" language does *not* apply to *this* part of Section 330(a), we can just as easily conclude that it does not apply to some *other* part of Section 330(a), such as the proviso for compensation of trustee's paraprofessionals. The statute itself seems to presume that the scope of the "subject to" language is obvious, but it is obviously not.

### 4. Case law approaches

Courts have struggled with the foregoing statutory provisions, with mixed results. For the most part, their struggle can be laid at the feet of the "plain meaning" rule of statutory construction, for most of the courts profess themselves bound by that rule in their application of these sections to the question of compensation for paraprofessional expenses. But as has been suggested in the previous section, that assumption may not be warranted.

The cases in this area fall in general into two camps, typified by *In re Stewart,* 151 B.R. 255 (Bankr.C.D.Calif.1993) and *Cavazos v. Simmons,* 90 B.R. 234 (N.D.Tex.1988).

#### a. The Stewart line of cases

One line of authorities, typified best by the recent decision by Judge John Ryan, out of the Central District of California, *In re Stewart,* attempts to hew closely to the precise language of the statute, concluding that the "subject to" limiting language in Section 330 applies to both the trustee's fee and whatever fees the trustee's paraprofessional might charge. *In re Stewart,* 151 B.R. 255, 258–59 (Bankr.C.D.Calif.1993); *see also In re Berglund Constr. Co., Inc.,* 142 B.R. 947, 949 (Bankr.E.D.Wash.1992); *Lanier Spa, Inc.,* 99 B.R. 490, 491 (Bankr.N.D.Ga.1989); *In re Prairie Cent. Ry. Co.,* 87 B.R. 952, 959 (Bankr.N.D.Ill.1988). Said the court,

> Congressional intent is clear. A trustee should not receive compensation for trustee services beyond the § 326(a) limits. Courts should not allow trustees to circumvent § 326(a) by shifting trustee services

to paraprofessionals. The concept behind encouraging use of paraprofessionals to perform trustee services was not to increase the costs of estate administration, but rather to reduce them by giving trustees the flexibility to be more efficient in performing their duties. The intent was certainly not to encourage trustees to collect more than the § 326(a) limits by merely shifting the trustee duties to paraprofessionals. Such a result would be contrary to Congressional intent to limit trustee compensation in the administration of bankruptcy cases.

*Stewart,* 151 B.R. at 259.

The rationale behind *Stewart's* conclusion is faulty, for it assumes that there is an "inner core" of trustee services that cannot permissibly be "shifted" to paraprofessionals. The court has employed a Section 327(d) analysis to bar compensation to a person who is neither an attorney nor an accountant. Nothing in either that section or its legislative history supports applying its proscriptions in any context other than the two narrow circumstances Section 327(d) itself governs. In all other circumstances, from hiring auctioneers, through storing inventory, through hiring paraprofessionals, the only tests imposed by the Code are two: (1) if the trustee desires to hire a professional to whom certain duties are to be delegated, the trustee must demonstrate that she needs that person to represent or assist her, and that person will be paid so long as the compensation is reasonable and the services actual and necessary (11 U.S.C. §§ 327(a), 330(a)(1)); (2) if the trustee desires to incur an expense in the delegation of her duties, she need only show that the expense was actual and necessary (11 U.S.C. § 330(a)(2)). In testing whether services are actual and necessary, we do ask whether the trustee *should* have performed the given task without assistance. We do *not* presuppose that there is any "nondelegable core" of trustee's services for which only Section 326(a) serves as the exclusive means of compensation, nor should we.[16]

---

16. There are really only three factors which seem to figure into fixing and defining trustee services:

(1) the trustee must *always* be compensated for having taken on the fiduciary duty of being trust-

Nor should we so quickly accept *Stewart's* pronouncement that "[c]ongressional intent is clear," for it is not. The suggestion that the concept behind encouraging use of paraprofessionals was to reduce the costs of estate administration (at least in the context of trustee paraprofessionals) is simply not borne out by the legislative history. H.R.REP. No. 595, at 330. The language upon which *Stewart* relies was referring to *attorney's* paraprofessionals, not *trustee* paraprofessionals—and they are *not* the same thing.[17] A trustee cannot save *the estate* money by using paraprofessionals in the fashion contemplated by *Stewart.* Because she works under a cap, according to *Stewart,* any additional expenses incurred would only go to reduce what she will ultimately be able to keep for herself. The estate realizes no savings because the trustee herself does not bill at any rate at all. Under *Stewart,* only if the trustee does *not* use a paraprofessional can she reduce her *own* costs of operation—but at the expense of not having experienced help in doing her job. She will still have done nothing to reduce the cost to the *estate.*[18]

In fairness to *Stewart,* there is an obvious difference between recovering for secretaries at cost and recovering for paraprofessionals at their "paraprofessional rate," for the latter presumptively incorporates a profit margin, just as do attorney billing rates. It is this feature which no doubt troubled Judge Ryan. The practical parallel to the abuses that can result from a trustee hiring *herself* as her own *attorney* motivated the court to employ the Section 327(d) analysis. But the bottom line is that Section 327(d) does not apply to this situation. Given that Congress explicitly acknowledged (and legitimized) the use of trustee's paraprofessionals in Section 330(a), it would have been easy enough for Congress *also* to have inserted explicit precatory language in Section 327(d) regarding delegation of duties to them. No such proviso was included and it is not appropriate for the courts to devise one out of whole cloth, at least not without a clearer indication from Congress.

The one aspect of the *Stewart* line of cases that does seem to be correct is their reading of the plain meaning of the statute: the placement of "trustee's paraprofessional" in Section 330(a)(1) seems linguistically to prevent their being compensated outside the Section 326(a) cap. According to Section 330(a), the only persons to whom the court may award compensation for services rendered are trustees, examiners, professional persons employed under Section 327 or Section 1103, and the debtor's attorney. 11 U.S.C. § 330(a); *In re Lanier Spa, Inc.,* 99 B.R. 490, 491 (Bankr.N.D.Ga.1989). The statute assumes that paraprofessionals will not apply for or be awarded compensation apart from the officer of the court by whom the paraprofessional is presumed to be em-

---

ee; (2) she may receive greater or lesser compensation (subject to the maximum of the cap) depending, in part, on the extent to which, in addition to assuming the fiduciary obligation, she has also performed the Section 704 duties rather than delegating them; and (3) she may be able to recover the expense of some delegation (e.g., the cost of storing inventory, the cost of preparing necessary forms to comply with U.S. Trustee guidelines), to the extent they are not classified as overhead.

**17.** The legislative history to this section explains that the explicit reference was made in order to confirm that courts could and should approve requests for compensation for paralegal time billed at an hourly rate. In 1978, the use of paralegals was still a recent phenomenon in the practice of law, and some courts questioned whether paralegal expense should in fact be subsumed in the firm's overhead (and, by extension, the hourly rates of the attorneys of the firm). The House Report says that "This provision is designed *to encourage attorneys to use paraprofessional assistance where possible,* and to ensure that *the estate, not the attorney,* will bear the cost, *to the benefit of both the estate and the attorneys* involved." H.R.REP. No. 595, 95th Cong., 1st Sess. 330 (1977), U.S.Code Cong. & Admin.News, 1978, p. 6286 (emphasis added). The "savings" the estate would realize, says the Report, would result from using paralegals, billed at their lower hourly rate, to perform tasks which the attorney would otherwise have to perform, at the attorney's *higher* hourly rate. *A priori,* the savings hinges on the difference between hourly rates.

**18.** It is no answer, either, that many lawyers who bill on a contingency basis also use paralegals, and incorporate them into their overhead. Lawyers can turn down cases that are not profitable. Trustees do not have a similar choice, short of leaving the panel entirely. And lawyers who bill on contingency also expect to be paid at least one-third of the total recovery, not just 3%.

ployed. Only the *trustee* can apply for compensation, and while the trustee is permitted to incorporate in her fee request the services of the paraprofessional, those services seem to be compensable only insofar as they are part and parcel of the trustee's services, just as the attorney's paralegal is compensated not as an independent item but as part and parcel of the attorney's overall compensation. We permit the paraprofessional to bill through the professional, but Section 330(a) itself makes no provision for allowing paraprofessionals to bill apart from the professional who employs them.

*Stewart* leaves us with a difficult conundrum, one created by the plain meaning of the statute itself. The provision for paraprofessionals, in the context of trustees, *punishes* rather than *rewards* trustees for using paraprofessionals. At 3%, most trustees could not afford to absorb the expense of paraprofessionals in any but the largest of cases, and large cases are the exception, not the rule. Given the tenor of the legislative history, it is difficult to believe that Congress even foresaw this problem when it wrote the statute as it did, for in practice, the statute has precisely the *opposite* result apparently intended by Congress in authorizing the use of paraprofessionals.

■ Certainly the current climate in Bankruptcy Code interpretation leans heavily to the application of the "plain meaning" rule as the first tool of statutory construction for which courts should reach. *See, e.g., U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). But the primary goal in construing a statute to which courts need aspire is that fashioned by Judge Richard Posner: "[t]he judge should try to think his way as best he can into the minds of the enacting legislators and imagine how they would have wanted the statute to be applied to the case at bar." R. Posner, *Statutory Interpretation—In the Classroom and In the Courtroom,* 50 U.CHI. L.REV. 800 (1983), *reprinted in* 3 SUTHER-

LAND, STATUTORY CONSTRUCTION 483, 495 (1992). In this case, the plain meaning of the statute fails to assist us in that task, for the "plain" meaning of the statute leads to an absurd result. Congress surely did not intend to insert a provision authorizing trustees to employ paraprofessionals, only to guarantee by its placement that, in virtually every circumstance, trustees could not afford to employ paraprofessionals—especially when their employment would not reduce the overall cost of administration (as it was expected to do when attorneys employed paraprofessionals).

■ It has been said that courts, in construing statutes, should strive to avoid attributing absurd designs to Congress. *Sheridan v. United States,* 487 U.S. 392, 403, 108 S.Ct. 2449, 2456, 101 L.Ed.2d 352 (1988). Statutes should also be interpreted to avoid untenable distinctions or unreasonable results whenever possible. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982); *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 776, 103 S.Ct. 1556, 1562, 75 L.Ed.2d 534 (1983). In this case, however, coming up with an alternative interpretation of the statute that works in practice without judicially amending the statute in the process proves to be quite difficult. The *Cavazos* line of cases attempts the task, and we examine that line next.

### b. The Cavazos v. Simmons line of cases

The court in *Cavazos v. Simmons* concluded that paraprofessionals constitute a separate compensable item, allowed to be paid under Section 330(a)(1), unrestricted by the cap on trustee's compensation. *Cavazos v. Simmons,* 90 B.R. 234, 239 and n. 14 (N.D.Tex.1988)[19] Said the court,

> While § 330(a) is subject to § 326, it is only governed to the extent of the express proscription of § 326 and not otherwise.

---

19. An important factual distinction between *Cavazos* and *Stewart* may well have influenced the divergent outcomes in the cases. In *Cavazos,* the paraprofessionals were all employed on a contract basis, so that none of the monies would become part of the trustee's office's overall gross receipts. In *Stewart,* the paraprofessionals *were* employees of the trustee's office, and the court chafed at the idea of the trustee "indirectly" recovering money over and above the § 326 cap. This problem of evading the cap was not present in *Cavazos,* for the trustee realized no financial benefit from the paraprofessionals' compensation being authorized.

Section 326(a) places a limit on compensation that the bankruptcy court may award under § 330 "for the trustee's services." The section does not purport to cap the compensation of a paraprofessional employed by a trustee. Section 330(a)(1) treats the services of a paraprofessional separately from the services of a trustee. The Code provision permits the court to award reasonable compensation both for services "rendered by [the] trustee" and services rendered "by any paraprofessional persons employed by such trustee." Section 326(a)'s limitation on compensation thus applies literally only to "the trustee for the trustee's services," and § 330(a)(1) instructs that the services are treated as a separate compensable item from the services of a paraprofessional.

*Cavazos v. Simmons*, 90 B.R. at 239. *Cavazos* relies for its analysis on a narrow interpretation of "trustee's services" as that term is used in Section 326(a) and, from what we have seen thus far, that approach is practical, in light of the way trustee's duties are routinely delegated in the typical chapter 7 case. The trustee is compensated for what *she* does, while other professionals to whom she may have delegated a portion of her duties are separately compensated, to the extent that their services are actual and necessary, and to the extent their compensation sought is reasonable. 11 U.S.C. § 330(a)(1). And trustees can recover the expense of certain items, to the extent they qualify as reimbursable expenses of administration, without having to absorb those expenses as overhead to be paid out of her own compensation. 11 U.S.C. § 330(a)(2). Whatever has not been delegated is presumed part of her own services, for which she is compensated, but her compensation is also capped by Section 326(a).

*Cavazos* then argues that the "subject to" language in the forepart of Section 330(a) applies only to the remaining portions of the section to which the particular limitation has particular reference. Thus, just as the Section 329 limitation has application only to requests for compensation by the debtor's attorney, so also should Section 326 have application only to requests for compensation

by the trustee—and not the trustee's paraprofessional. *Cavazos, supra,* at 239.

We return to the principles of statutory construction we referenced earlier, especially Judge Posner's wise counsel to think our way as best we can into the minds of the enacting legislators and imagine how they would have wanted the statute to be applied to the case at bar. Certainly the *Cavazos* approach removes an absurdity from the statute, but is it also how Congress would have applied the law to the case at bar? Another look at the legislative history suggests that it is. As we have already observed, Congress had in mind principally attorneys when it made provision for use of paraprofessionals in the new Code. *See* note 17, *supra.* Most trustees at that time, as now, were attorneys. It is not a far stretch to think that Congress presumed that these attorney/trustees would want to use their paralegals to assist them in performing their duties as trustees. What is more, the "pass through" aspect of paraprofessional costs was apparently considered by Congress, and Congress appears to have, on balance, concluded that it was better for estates to bear the cost of these persons, rather than having the persons who employ them absorb them as overhead: "This provision is designed to encourage attorneys to use paraprofessional assistance where possible, *and to insure that the estate, not the attorney, will bear the cost,* to the benefit of both the estate and the attorneys involved." H.R.Rep. No. 595, at p. 330 (emphasis added).

The notion of reducing the cost of administration admittedly suffers under this interpretation, but then again, this is at best a mixed message in the Code. The overall thrust of the legislative history attached to Section 330 is to *depart* from the "economy of administration" notion that was the hallmark of practice under the Bankruptcy Act, and to bring overall all fees into line with comparable non-bankruptcy services: "Bankruptcy specialists, ... if required to accept fees in all of their cases that are consistently lower than fees they could receive elsewhere, will not remain in the bankruptcy field." House Report, at 330, U.S. Code Cong. & Admin. News 1978, p. 6286. The term "bankruptcy specialists" certainly includes

those attorneys who deign to serve as trustees, and it is reasonable to think that Congress had that thought in mind when it wrote out its explanatory notes.

One aspect of *Cavazos* that no doubt made the conclusion it reached more palatable was the fact that the paraprofessionals there in question were not employees of the trustee (obviating the abuse consideration that drove *Stewart*), but were independent contractors. *Cavazos*, 90 B.R., at 235 and n. 2. Fewer questions can be raised about a trustee's "evading the cap" by delegating duties to a paraprofessional when the resulting receipts from billing do not become a source of profit for the trustee (or a device with which to cover other overhead items). However, there is still great uncertainty about the propriety of "contract paraprofessionals" otherwise unattached to a professional. In the law area, the risk of unauthorized practice of law is great when paralegals offer services apart from a supervising attorney. There is no similar risk with respect to trustee's paraprofessionals, but only so long as they are not performing legal work. And if they are, then courts *would be* justified in raising the Section 327(d) question, for at that point, the trustee must be presumed to be supervising, and thereby acting as an attorney.[20] The caveat applies equally regardless whether the paraprofessionals in question are employees of the trustee or are "contract paraprofessionals." The court does not intend to enter the fray over whether current state law authorizes the latter category, though the legislative history to the Code gives no indication that *Congress* ever contemplated such a possibility. In either event, however, much of the concern about abuse is easily enough resolved by simply regulating the *rate* the trustee's paraprofessional is charged out at. *See* discussion *infra*.

One other point in *Cavazos* answers an issue raised in this case. The court there concluded that trustees' paraprofessionals need not be "retained" as though they were professional persons, observing that, "[t]o hold that a paraprofessional must (or even may) be compensated as a professional is to misconstrue both §§ 330(a)(1) and 327(a)." *Cavazos*, 90 B.R., at 239 n. 14. This court agrees with this point, even though, as a practical matter, it would be useful were trustees required to obtain prior court approval before they use paraprofessional assistance. Congress presumed that the paraprofessional was "part of the package" that the estate "purchased" when it "hired" a professional, and, from what we have gathered from the legislative history, Congress fairly presumed that the trustee's paraprofessional was part of the package the estate got when a trustee was appointed. True, courts could exercise better control over estate administration were the Code to specifically require court approval for their use. But without a more specific statutory directive from Congress, courts are left out of this loop.

Fortunately, however, trustees do not have an entirely free hand in their use of paraprofessionals, for their staffing arrangements are subject to the supervision of the United States Trustee, whose task it must be to evaluate the delegation of duties to paraprofessionals against the resulting cost to the estate's administration, while still keeping in mind the practical economies that plague a panel trustee's operation. The United States Trustee already performs this very function in this district with regard to the closely analogous use of "secretarial staff" by trustees, requiring these personnel to maintain detailed time records and setting hourly rates for the recovery of their cost as a reimbursable expense of the estate. Extending that function to the trustees' paraprofessionals does not exceed the purview of the United States Trustee's responsibilities, and offers a measure of control against excessive cost, overreaching and abuse.

> United States Trustee requires other office personnel of a panel trustee to maintain detailed time records disclosing the nature of services performed. A similar obligation must be imposed on paraprofessionals employed by a trustee, so that those records can be scrutinized by the United States Trustee for potential abuse.

---

**20.** In the case at bar, the trustee proposes to use these assistants solely to help him in the discharge of non-legal services. That is a difficult distinction to honor, but if he does not, he risks serious scrutiny, either for *sub rosa* engaging his law firm without court authority or for participating in a scheme to evade this state's rules regarding the unauthorized practice of law. The

### c. Conclusions about the case law

This court concludes that the *Cavazos* approach to the problem offers the better solution, one which makes sense of the difficult conundrum created by the less-than-plain language of the statute and which seems to be consistent with the intentions of the drafters.

### 5. Rules regarding the use of paraprofessionals

Our task is not yet complete, for there are still the thorny questions of under what circumstances a trustee should be permitted to use paraprofessionals (recalling our earlier point about when a trustee should and should not delegate), and what to pay these paraprofessionals if the delegation proposed here is justified.

### a. Whether to delegate to paraprofessionals

The Trustee in this case proposes to use [21] these two assistants to help him administer the case, by maintaining the various accountability records required by the United States Trustee, reviewing proofs of claim, investigating allegations of impropriety against the debtor, investigating potential causes of action,[22] gathering estate books and records, helping to gather and maintain estate property, and the like. Some of these functions could be performed by the highly skilled secretarial staff that many trustees routinely maintain (and for which they are able, in this district, to be reimbursed). Others go beyond the more ministerial functions usually performed by such staff and demonstrate the creative ways in which paraprofessionals can substantially extend the capacity of the trustee to effectively administer a large number of cases.

Were this a district in which secretarial staff costs could not be recovered by the trustee, this issue would take on considerably larger importance. *See In re Orthopaedic Technology, Inc.*, 97 B.R. 596, 601–02 (Bankr. D.Colo.1989) (following *Cavazos* in permitting trustees to be paid for their use of paraprofessionals, but prohibiting compensation for any "secretarial" work done by the paraprofessional). But in the Western District of Texas, such costs *are* recoverable (and should be).[23] The only real question for us is whether the trustee should use presum-

---

21. Actually, the *nunc pro tunc* applications indicate that the Trustee already *has* used these two persons in the capacities in which he maintains they should be used.

22. Care must be taken here—it is one thing to investigate, but the *evaluation* of these causes of action is either the sole province of the trustee, or requires the services of an attorney.

23. An extended discussion of this issue is beyond the scope of this opinion. Suffice it to say that, given the miniscule compensation of trustees in bankruptcy when compared to the compensation of other service professionals both in and out of bankruptcy, and given their inability to reject uneconomical cases (an option available to virtually every other service provider in and out of bankruptcy), the notion of what constitutes trustee's overhead, expected to be paid out of the trustee's compensation, must be considerably more restricted than it would be for other service providers.

 A Chapter 7 trustee, being subject to a compensation cap, does not have the luxury of recovering his overhead expenses by increased compensation. He must separately bill all expenses, including overhead.... The U.S. Trustee ... contends that such expenses must be subsumed by the § 330 compensation of [the] Chapter 7 Trustee.... To the contrary, if effect is given to the clear statutory language, there is no problem. Reasonable compensation is payable. Expenses are reimbursable. If Congress intended otherwise, it would have said so....

 Whether a professional gets to recover his overhead should not turn on whether he includes that recovery in his hourly rate, or whether he candidly calls it what it is, to wit: overhead expense. The evil to be guarded against is not the labeling of the payment. The evil is double collection. Lawyers, having freedom to fix their hourly rates, can include their overhead in that rate. A Chapter 7 trustee, on the other hand, is faced with a fixed maximum *compensation.* He must therefore call his overhead expenses what they are—and recover them as such—if he is to recover them at all. No double recovery is present.

*In re Miguel,* 123 B.R. 634, 637 (Bankr.E.D.Calif.1991); *see also In re Stanley,* 120 B.R. 409, 414 (Bankr.E.D.Tex.1990). To the extent that secretarial services can be specifically identified to the administration of a particular case, trustees should be able to recoup the cost of those services (at cost) via Section 330(a)(2). Any broader construction of "overhead" in the context of chapter 7 panel trustee administration would quickly drive many of our trustees out of the "business."

ably more costly paraprofessionals to perform certain delegated duties instead of less costly "secretarial" personnel, assuming that a delegation is otherwise justified at all.

■ In a sense, the question is its own answer, for if certain functions can be adequately and efficiently performed by a less costly provider of the service, then that is the correct choice. If on the other hand the paraprofessional in question can perform certain tasks more ably than could some other member of the trustee's staff (e.g., performing a UCC search, investigating the factual allegations concerning an alleged impropriety on the part of the debtor), then the greater cost of the paraprofessional might well be justified. It makes no sense to lay out specific guidelines, for that is really an administrative function for which the United States Trustee is better suited than this court. That office is in a much better position to evaluate what personnel are available to a given trustee in a given locale, and to decide what is a practical recoverable compensation for their services. A trustee who elects to use a paraprofessional must justify that election to the United States Trustee, and the United States Trustee in turn must regularly evaluate its various panel trustees to ferret out those that are simply too expensive overall. Panel trustees serve at the behest of the United States Trustee, who can presumably cease appointing trustees who fail to abide by cost-cutting directives. This court will thus leave it to that office to perform this essentially administrative task.

### b. What to pay trustees' paraprofessionals

■ The Trustee here proposes to bill out these paraprofessionals at $40 and $45 an hour, which is slightly over half their normal hourly billing rate as attorney paraprofessionals. The Code counsels courts to authorize compensation at "the cost of comparable services other than in a [bankruptcy] case ... " 11 U.S.C. § 330(a)(1). But what is comparable to the services of a trustee's paraprofessional? The Trustee here wisely

does not presume that attorney paraprofessional rates are "comparable," for they are not. The duties and responsibilities are different, to start with (as we cautioned above). But if we do not use attorney paraprofessionals as the yardstick for comparable services, what do we use?

■ The legislative history gives a small clue in the way in which it handles the paraprofessional issue: "In nonbankruptcy areas, attorneys are able to charge for a paraprofessional's time on an hourly basis, *and not include it in overhead.*" HOUSE REPORT, at p. 330, U.S.Code Cong. & Admin. News 1978, p. 6286 (emphasis added). The unspoken assumption is that the hourly rate approximates what would otherwise have to be absorbed as overhead.[24] That assumption furnishes a sensible basis for measuring appropriate compensation for trustees' paraprofessionals—they should be billed at a rate which is sufficient to cover their cost. Employing a cost approach also avoids the abuse issue that so bothered the court in *Stewart,* for it eliminates the potential for trustees' using the paraprofessional as a profit center.

The materials the Trustee in this case submitted to the court indicate that the Trustee here arrived at the proposed billing rate for these paraprofessionals by computing, then attempting to offset, the loss the law firm is ostensibly suffering as a result of the Trustee's not being able to recover the direct cost of the paraprofessionals outside his statutory cap. Again, the United States Trustee is in a far better position to correctly evaluate this assertion than is this court. However, a cost approach is the one commended to the United States Trustee, as opposed to whatever "hourly rate" paraprofessionals might be billed out at as attorney paraprofessionals.

### 6. Some closing observations

■ Trustees can and do routinely delegate their duties to others in their administration of cases. In all but the special circumstance governed by Section 327(d),

---

**24.** Again, it is doubtful that Congress, in 1978, foresaw the dramatic rise in paraprofessional rates, or the movement toward expecting even this billing center to also serve as a source of profit for the law firms that employed them.

they should be guided in this delegation by the facts of each case, taking into account the extent to which they could reasonably (and efficiently) perform the given task themselves, and the cost to the estate if the task is delegated. These are the only real limits on delegation outside the Section 327(d) context. There is no identifiable "core" of nondelegable trustee duties, short of the fiduciary obligation itself. The trustee must be responsible for the entire administration of the case, and the trustee alone must make the decisions. But beyond that, delegation is not prohibited by the Code, and it should not be prohibited by any unfortunate *per se* rules issued by courts, other than, perhaps, when the trustee seeks to hire herself as her own accountant or attorney.[25]

A trustee's own compensation, meanwhile, capped by Section 326(a), may (perhaps should) vary depending on the extent to which her duties have been delegated to others,[26] though it will almost never disappear (absent some impropitious conduct on the part of the trustee), for she is at least entitled to be compensated for having assumed the fiduciary role of trustee in the first place, with all the responsibility that entails. In small cases, the amount of compensation is so small that it is unlikely to be disturbed at all (again, absent some impropitious conduct). In the rare large case, the court may well want to substantially adjust the trustee's compensation, depending on the extent to which trustee services have been delegated to others (in whatever capacity). And in some cases, the court may well need to deny requests to retain professionals where it appears to be unnecessary for the trustee to delegate. The court has considerably less control over the delegation to persons whose cost will be passed through to the estate as an expense item, not having the opportunity to review these items (if at all) until the Trustee's Final Report is filed. The United States Trustee, however, has substantial authority to monitor and control these costs—and in fact does so now, consistent with Congress' original intent that the *administrative* tasks associated with overseeing the bankruptcy system should be performed not by the court but by that office.

Perhaps the one unfortunate aspect of this entire analysis is that it will almost certainly permit the cost of chapter 7 administration to increase. Despite the concerns expressed in numerous cases regarding the importance of keeping down the cost of bankruptcy administration (most notably and recently, *In re Stewart*, cited *supra*), the statute itself, in Section 330(a), emphasizes that compensation is to be awarded based on "the cost of comparable services other than in a case under this title." 11 U.S.C. § 330(a)(1). To the extent that trustee's services are comparable to anything outside of bankruptcy, their extremely low fee warrants significant pass-throughs. Were chapter 7 trustees compensated at, say, 10% of monies disbursed (as are trustees today in Chapter 13), a much stronger argument could be made for trustees absorbing some of their operating ex-

---

**25.** Section 327(d) is so problematic that perhaps it ought to be the focus of greater Congressional scrutiny. *See* ABI REPORT, *supra* at pp. 43–44.

**26.** The common practice today is for trustees to routinely request the maximum fee and for courts to routinely grant it without comment. Under the analysis employed in this decision, that may no longer be an appropriate thing to do. But if we depart from this accepted practice, we will only be fulfilling a clearly expressed congressional intention that the Section 326(a) cap represent the *maximum* allowance, not the *expected* allowance. HOUSE REPORT, at p. 327. Unfortunately, for so long as inadequate trustee compensation continues to plague the bankruptcy system, judges will continue to find it hard to make their trustees' lives even more difficult than they already are. And even more unfortunately, this is hardly a problem new to Congress:

In Analysis of H.R. 12889, 74th Cong., 2d Sess. (1936) 165, Referee Paul King, Chairman of the National Bankruptcy Conference, stated: "It is recognized that compensation of trustees in bankruptcy, particularly in small cases, is inadequate for the services rendered, and the proposed amendments, adapted from the Hastings–Michener Bill, will help to some extent in remedying this defect." In Weinstein, Bankruptcy Law of 1938, A Comparative Analysis Prepared for the National Association of Credit Men (1938) 96, it is suggested that perhaps the prospect of more reasonable compensation will secure a better type trustee and make for better administration of small estates. J. MOORE, L. KING, 2A COLLIER ON BANKRUPTCY, ¶ 48.-06, at p. 1799 n. 8 (14th ed. 1964).

penses as part of their overhead. But so long as it remains at the current level, creditors must not count on a windfall—and that is precisely what chapter 7 has been in most small cases up until now.[27]

### 7. Conclusion

■ For the reasons stated in this opinion, the court finds that the Trustee in these cases need not retain the two persons he proposes as paraprofessionals pursuant to Section 327(a). The court further finds that the Trustee may employ these two assistants as paraprofessionals, and recover compensation for their services, at a rate which approximates the actual cost of these persons. The Trustee is directed to confer with the United States Trustee regarding an appropriate hourly rate for these paraprofessionals, and to amend his Final Reports in these cases accordingly, if necessary.

Since taking this matter under advisement, the Final Reports in a number of other cases being administered by this Trustee have been set for hearing, and held in abeyance pending the decision in this case. The Trustee is directed to handle all of those cases in the same fashion, as the ruling in this matter applies with equal force to all of those cases.[28]

**So ORDERED.**

---

**27.** Stories abound of trustees getting rich off the bankruptcy process, but they fall into two categories that actually demonstrate the correctness of this assertion. The first category are the crooks, those who have found ways to gouge from estates by breaching their fiduciary duty. *See, e.g.,* D. Dietz, "Moves to Reform Bankruptcy," *San Francisco Chronicle,* July 15, 1991, at p. B1 (detailing the conviction of a Bay Area bankruptcy trustee for stealing over $1.9 million, most from small estates). The second are the attorney-trustees who have been able to make large attorneys' fees from hiring themselves in cases in which they are trustees. *See, e.g.,* "Reaping Profits at Bankruptcy Court," *St. Petersburg Times* (October 20, 1991). If the system worked properly (and if Congress also modified or repealed Section

327(d), which authorizes trustees to retain themselves as their own attorneys), so that trustees could actually make a decent return off of being trustees, the incidence of both categories of abuse would, in this court's view, substantially diminish.

**28.** Congress simply *must* take another look at Section 330(a) and clarify for all of us just what it really intends to authorize. Much of the cause of our difficulty in this opinion, in fairness to Congress, is the growth of the paraprofessional phenomenon since 1978. But the statute was not clear even in 1978. Now is an especially propitious time for Congress to address the problem and resolve the rampant conflict and confusion in the case law.